IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SARAH D. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:09CV795-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Plaintiff Sarah Jones brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income under the Social Security Act.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff was born on November 26, 1965, and graduated from high school in 1984. (R. 76, 94).  She filed the present application for disability on May 30, 2006 (protective filing date), reporting that she last worked in October 1991 in the bakery department of a grocery store and that she left that job because she "moved to another city and had to give up [her]

job." (R. 88, 104, 128).  She alleges that she became disabled on October 29, 2005[1] due to

bipolar disorder, depression, thyroid problems, back pain, shoulder pain, allergies, sleep

apnea, fibromyalgia, spastic colon, hypertension, bursitis in her knees, hiatal hernia, and

lower back injury from a car accident several years previously.  (R. 88).  On September 2,

2008, after plaintiff's application was denied initially, an ALJ conducted a hearing.  The ALJ

issued a decision on October 28, 2008, concluding that plaintiff has "severe" impairments

of osteoarthritis, depressive disorder and anxiety disorder but does not have an impairment

or combination of impairments that meets or medically equals an impairment in the

"listings."  The ALJ determined that plaintiff retains the residual functional capacity to

perform jobs existing in significant numbers in the national economy[2] and, therefore, that she

was not under a disability, as defined in the Social Security Act, since May 30, 2006.  (R. 9-

18).

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v.

---

[1] In her application, she alleges that she became disabled on January 2, 1992.  (R. 76).  However, the alleged onset date was later adjusted to October 29, 2005, apparently because plaintiff's previous application for disability was denied on October 28, 2005.  (R. 85).

[2] The ALJ found that plaintiff had no past relevant work.  (R. 17).

<u>Shalala</u>, 985 F.2d 528, 531 (11th Cir. 1993); <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion."  <u>Id</u>.  Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  <u>Davis</u>, 985 F.2d at 531.

### DISCUSSION

**Sleep Apnea**

<u>Evidence Regarding Sleep Apnea</u>

Plaintiff argues, *inter alia*, that the ALJ erred by failing to consider her sleep apnea and its affect on her ability to work. (<u>See</u> Plaintiff's brief, Statement of Issues, Issue V).  One of plaintiff's primary complaints, at the hearing before the ALJ, was that she suffers from fatigue due to her sleep apnea. (<u>See</u> R. 27, 30, 32).  She testified that she is "drowsy . . . from the sleep apnea[,]" and that "most of the time I'm asleep because I, I wake up for about an hour or two.  After a[n] hour or two of being up, then I wind up being sleepy again. So I wind up sleeping most of the day[.]" (R. 27).  She stated that she is "usually always tired from the sleep apnea." (R. 30). She described her day as follows: "I get up about five after 6, and I have . . . to wake my, all three kids and tend to them, and then I take them to school, and then I lay back down. Then I'm up for about two hours.  After I've gotten up, about 10, 11:00, I'm up for maybe two hours and then I'm back to sleeping agin until about 3 until I have to go get the little boy from school, and then by the time I'm up an hour or two there, then I'm like

sleepy before bedtime too."  (R. 32).

In March 2004, plaintiff reported "generalized fatigue, tiredness, [and] sleep interruption" to Dr. Bonnie Dungan of Southern Bone & Joint Specialists.  Dr. Dungan suggested that plaintiff follow up with her psychiatrist and with her primary physician. (R. 153-54).[3]  On September 13, 2004, plaintiff complained to her primary care physician, Dr. I. Douglas Jackson, that she snores and is "sleepy all the time and falls asleep easily." He wrote, "She needs sleep apnea screening. She is obese and has fatigue and fibromyalgia." (R. 161).  Later that month, plaintiff saw Dr. Ann McDowell, who scheduled her for a "full nocturnal polysomnography" to evaluate her complaints.  (R. 140-41).  The sleep study was conducted on October 1, 2004.  (R. 143-47).  After reviewing the results of the sleep study, Dr. McDowell's impressions were: (1) "OSA" [obstructive sleep apnea]; (2) no REM sleep; and (3) tachycardia.  (R. 143).  In mid-November, 2004, plaintiff told her psychiatrist, Dr. West, about the preliminary testing and that she "was felt to have sleep apnea."  He wrote, "They have to do one more test and are contemplating beginning C-Pap. She is hopeful that this may make things better for her."  (R. 203).[4]

---

[3]  Dr. Dungan recommended that plaintiff follow up with Dr. Jackson "to make sure her thyroid studies are normal."  (R. 153). Dr. Jackson prescribed hormone replacement medication for plaintiff's hypothyroidism and routinely checked plaintiff's TSH (thyroid-stimulating hormone) level. (See Exhibit 5F, 17F-19F).  He did so on September 13, 2004, and Dr. McDowell also had plaintiff's TSH and T4 levels checked on October 2, 2004; the reported results were within the normal range.  (R. 186-188).

[4]  Plaintiff was treated by Dr. Wildrick in 1995 and early 1996; Dr. West began treating plaintiff upon Dr. Wildrick's departure.  (Exhibit 7F).  Plaintiff saw one of these two psychiatrists fifteen times between early 1995 and early 2000.  After a lengthy break, plaintiff resumed treatment with Dr. West in October 2003, with complaints of anxiety attacks and depression.  She reported that she had been "doing okay until about three months ago." (R. 210; see Exhibits 7F, 15F).  Plaintiff alleges disability due, in part, to "bipolar."  (R. 88).  However, Dr. West has treated plaintiff only for depression and anxiety – managing

In December 2004, however, Dr. McDowell sent a letter to the plaintiff, copying Dr.

Jackson.  Dr. McDowell wrote:

> I have been informed that you have chosen not to undergo the sleep study (second night) that has been prescribed for you. I am writing to make sure that you clearly understand the implications of not following through with therapy.
>
> You were recently diagnosed as having obstructive sleep apnea. What this means is you stop breathing in your sleep, as you were told, causing your oxygen level to fall.  This can, over a long term, cause chronic damage to your heart and lungs.  It also can make you significantly drowsy causing great risk if you were to drive a car or operate heavy equipment.
>
> Until you have been successfully treated, I recommend that you do not drive or operate any heavy equipment. If you feel that you have improved significantly and you no longer have any significant daytime sleepiness, then we need to repeat the overnight sleep test to document this. Otherwise, I recommend that you do not drive as noted above.

(R. 316).  The following month, in his treatment note for plaintiff's office visit of January

11, 2005, Dr. Jackson wrote, "She had obstructive sleep apnea via Dr. McDowell when we

sent her over there to be tested.  She hasn't gone for final testing and doesn't have her C-PAP

yet. Hopefully she can get that done and she can increase her energy level and the way she

feels." (R. 159).  In the concluding section of his treatment note, he wrote, "She will call us,

if she is not better. She may need to get back in to see Dr. Dunn.[5]  He has been following her

for fibromyalgia. We await final sleep study."  (R. 160).  Nine days later, plaintiff told Dr.

West that "[t]hey have still not reached any definitive conclusions about her hospital sleep

---

it effectively with prescription medications –  and plaintiff's mental health treatment notes include no diagnosis of bipolar disorder.  (See Exhibits 7F, 15F).

[5] The record includes no treatment notes from "Dr. Dunn."  This appears to be a transcription error, as Dr. Dungan followed plaintiff for fibromyalgia. (See Exhibit 4F).

apnea but she is scheduled to go back for another study in February or March.  She does continue to have low energy and a tendency to go back to sleep in the morning after the children go to school but reports some difficulty maintaining sleep at night."  (R. 202).

Three months later, on April 21, 2005, plaintiff reported that "[s]he is not able to afford C-Pap so has not been able to get the help that she needs with her sleep apnea. . . . She has continued to have low energy and a tendency to sleep excessively during the day but needs medication to sleep at night."  (R. 201).  In July 2005, plaintiff told Dr. West that she "[s]till can't afford C pap" and that she "gets little sleep and this leaves her with very little energy and impaired concentration.  Has to pay for her medication and get reimbursed so her ability to afford medication is limited."  (R. 200).  In his treatment note for October 18, 2005, Dr. West noted plaintiff's complaint that, "she still does not have the financial resources to pay the deductible to get the CPAP machine, as a result of which she has continued to have active problems with sleep apnea."  (R. 199).  On January 17, 2006, plaintiff told Dr. West that she had been "turned down for disability," and that her "sleep apnea continues to be an issue because of inability to afford CPAP."  (R. 198).[6]

On January 25, 2006 – four months before plaintiff filed the present application – plaintiff returned to her primary care physician for the first time in over a year.  Dr. Jackson wrote, "Patient has obstructive sleep apnea, but is not using her C-PAP. We have encouraged

---

[6] The medical treatment discussed to this point occurred before the denial of plaintiff's previous application and, thus, before the alleged onset date for the current application for SSI.

that she try to get that arranged.  She is trying to make arrangements to have that done."[7]

Plaintiff asked Dr. Jackson to refer her to Dr. Scott Robbins "for possible consideration of gastric bypass," which Dr. Jackson agreed was "a good idea."  (R. 158).

On March 6, 2006, plaintiff went to Dr. Robbins for evaluation. She reported her previous medical history, including her diagnosis of obstructive sleep apnea. (R. 192). Dr. Robbins wrote, "needs 2nd night SS [sleep study]." His diagnoses were "OSA," hypertension and degenerative joint disease.  (Id.).[8]  Under "Planned Tests," Dr. Robbins included "2nd SS[.]" (Id.).[9]

---

[7]  In this January 2006 appointment, Dr. Jackson noted that plaintiff's "[f]ibromyalgia seems to be stable."  (R. 158).

[8]  The ALJ interpreted the acronym "OSA" as "osteoarthritis."  (See R. 13, 16).  However, in view of Dr. Robbins' concurrent diagnosis of "DJD" and his notations regarding the necessary sleep study, it is apparent that "OSA" refers to obstructive sleep apnea. The record evidences no further treatment by Dr. Robbins.

[9]  The record includes treatment notes for plaintiff's visits to Dr. West on March 1, 2006, and June 5, 2006 (R. 196-97).  The next visit reflected in the record occurred on February 25, 2008, and plaintiff returned to Dr. West again on June 16, 2008.  (R. 270-71).  The notes for these four office visits include no references to plaintiff's sleep apnea. The administrative transcript includes no notes of treatment by Dr. Jackson for the two and a half year period between January 2006 and June 2008. (See Exhibits 5F, 21F and R. 275-76).  Plaintiff was admitted to the hospital on June 1, 2008, through the emergency room after she complained of abdominal pain and severe diarrhea for the previous week and was found to have severe electrolyte abnormalities.  Dr. Jackson asked for a consult from GI Medicine and Dr. Daniel F. Jackson evaluated plaintiff on June 2, 2008. Plaintiff told Dr. Daniel Jackson that she usually is chronically constipated, with bowel movements twice each week.  Dr. Daniel Jackson suspected that plaintiff's acute gastroenteritis was "most likely viral in origin." He agreed generally with Dr. Doug Jackson's course of treatment and recommended a few additional tests.  Dr. Daniel Jackson included plaintiff's report of "sleep apnea not on CPAP" in his report of the consultation but his recommendation addressed only the acute GI problem. (R. 273-74).  According to Dr. Doug Jackson's discharge summary, plaintiff "rapidly cleared from her symptoms and electrolytes improved." She was discharged on June 4, 2008, with instructions to follow up in his office. (R. 275-76).  At a follow up appointment on June 23, 2008 – the most recent treatment date reflected in the administrative record for any provider – Dr. Jackson went over the discharge summary with plaintiff, noting that she been found to have gastroenteritis, irritable bowel and a kidney infection. She reported no diarrhea since getting out of the hospital, no abdominal pain, and no urinary symptoms.  Her only complaint to Dr. Jackson was of "low back pain when she sleeps and when she twists and turns."  However, on examination, she had "no point spinal tenderness," no neurologic deficits and no radiation of the pain down her legs.  Dr. Jackson prescribed Ultram, Bactrim and back exercises. Plaintiff voiced no complaint regarding her sleep apnea.  (R. 331).

There are no records indicating that plaintiff sought treatment for or further evaluation of her sleep apnea at any time after she filed the present application.[10]  In the disability report she filed in support of her application for SSI, plaintiff listed Dr. McDowell as one of her medical providers but stated, "I went for one visit and they told me I had sleep apn[e]a but I cannot afford to visit these doctors due to the co-pay."  (R. 91).  Thereafter, on July 21, 2006, Disability Determination Services (DDS) sent plaintiff to Dr. Sam Banner for a consultative physical examination.  (Exhibit 9F, R. 234-37).  Dr. Banner recorded plaintiff's "Chief Complaints" as follows:

> Claimant states she was diagnosed with depression and anxiety thirty years ago. She is currently under the care of Dr. West (Psychiatrist). Patient also complains of multiple joint pain, daily diarrhea and daily episodes of fainting. She also complains of difficulty walking, standing and sitting for prolonged periods. Patient remains under the care of Dr. Jackson (Internal Medicine).

(R. 234).[11]  Under "Past History," Dr. Banner lists bipolar disorder, hypertension, irritable bowel syndrome, osteoarthritis, thyroid disease and fibromyalgia. (Id.).  His report makes no

---

[10]  Plaintiff testified at the administrative hearing that she had continued to see both Dr. West and Dr. Jackson regularly. The ALJ observed that the records before her ended in 2006 and suggested to plaintiff's counsel that he obtain the more recent records. (R. 30-31). She granted counsel's request to leave the record open for seven to ten days so that he could get updated records from Dr. Jackson and Dr. West (R. 33) and, at the conclusion of the hearing, reminded plaintiff's counsel that she was leaving the record open as he had requested and that he should let her know if he needed more time. (R. 40). The records submitted by plaintiff after the hearing include records for treatment which occurred *before* 2006 and the few instances of treatment in 2008 discussed *supra*, in n. 9. (See R. 22-23 (ALJ admitting medical exhibits 1F through 14F at the hearing) and R. 270-334 (Exhibits 15F through 21F)).

[11]  Plaintiff's report to Dr. Banner of her diagnoses of depression and anxiety thirty years previously – *i.e.*, in 1976 – is inconsistent with her report to the DDS that she has had depression since 1994. (See R. 100). Plaintiff told the consultative psychologist, Dr. Ghostley, that she began having mood swings in eighth grade and began taking antidepressant medication in 1991. (R. 247). Plaintiff's complaint to Dr. Banner of "daily episodes of fainting" is the only such complaint in the record. Additionally, her report to him of "daily diarrhea" is inconsistent with Dr. Robbins' treatment note for plaintiff's visit four months earlier, indicating that she had no complaints of diarrhea (R. 192) and her report to Dr. Daniel Jackson in June 2008, upon her hospitalization with diarrhea, that "usually she is chronically constipated . . . and usually she is happy going once or twice a week with her bowels" (R. 272).

reference whatsoever to any complaint by the plaintiff of fatigue or of sleep apnea.  (R. 234-37).[12]

However, when plaintiff saw Dr. David Ghostley, Psy.D., for a consultative *psychological* evaluation a month later, on August 18, 2006, she told him that she "is applying for Social Security benefits as compensation for Depression, as well as numerous physical conditions including Fibromyalgia, Irritable Bowel Syndrome, Sleep Apnea, Hypothyroidism, and Hypertension." (R. 247).  Plaintiff described her daily activities to Dr. Ghostley, stating that, after she gets her husband and children off to school, "she lays back down to rest" and that, during the day, she "tries to do housework with frequent breaks." (Id.).[13]

In his "Statement of Facts" before this court, plaintiff's counsel writes:

[Plaintiff] was referred to Dr. Ann B. McDowell by Dr. I. Doug Jackson in 2004. [Plaintiff] was seen by Dr. McDowell on September 22, 2004 at which time a sleep study was performed.  The sleep study results showed that Ms. Jones suffered from obstructive sleep apnea, had no REM sleep and had tachycardia.  Dr. McDowell ordered a C-PAP machine for the claimant to use nightly but the claimant did not at that time have the finances to obtain the machine.  The claimant continues to suffer from obstructive sleep apnea which causes her to be sleepy throughout the day, as well as to suffer severe tiredness. [Plaintiff] continues to be unable to financially afford a C-PAP machine.

(Plaintiff's brief, Doc. # 13, p. 5)(citing R. 140-147).   Plaintiff overstates the evidence of record.  The cited records substantiate only the first three sentences of the paragraph quoted above.  There is no evidence that Dr. McDowell ever prescribed a C-PAP machine for the

---

[12]  Plaintiff told Dr. Banner that she "[d]oes some babysitting in her home."  (R. 234).

[13]  Contrary to her report to the DDS that she last worked in 1991 and left her job because she moved to another city (R. 88), plaintiff told Dr. Ghostley that she stopped working in 2000 "due to stress." (R. 247).

plaintiff to use; Dr. McDowell prescribed a second night of sleep study, which plaintiff never completed. (See R. 316)(Dr. McDowell's letter, stating, "I have been informed that you have chosen not to undergo the sleep study (second night) that has been prescribed for you."); see also R. 203 (plaintiff's 11/17/04 report to Dr. West that she had been in for "*preliminary testing* and was felt to have sleep apnea" and that "[t]hey have to do one more test *and are contemplating beginning C-Pap*")(emphasis added); R. 202 (plaintiff's 1/20/05 report to Dr. West that "[t]hey have *still not reached any definitive conclusions about her hospital sleep apnea but she is scheduled to go back for another study*")(emphasis added). While plaintiff later complained to Dr. West, her psychiatrist, that she could not afford a CPAP, her counsel's "statement of fact" that Dr. McDowell prescribed CPAP therapy is incorrect. Additionally, plaintiff's counsel's statement that plaintiff "continues to suffer from obstructive sleep apnea" may be based on plaintiff's testimony at the hearing and her complaint to the consultative psychologist, but it is not reflected in the medical evidence counsel cites. The only diagnostic testing for sleep apnea occurred in October 2004, twenty-one months before plaintiff filed the present application; the single reference to plaintiff's sleep apnea in a treatment record dated after the filing date of the application was the note of the consulting GI Medicine physician during plaintiff's hospitalization in June 2008 of plaintiff's report of "sleep apnea not on CPAP." (R. 273-74). Counsel's statement that plaintiff "*continues to be* unable to financially afford a C-PAP machine" (emphasis added) is not supported by the cited evidence or elsewhere in the record before the court.

Arguments Regarding Sleep Apnea

Plaintiff's Contentions. Aside from plaintiff's statement of the issues (Doc. # 13, pp.

3, 9), stating her contention that the ALJ erred by failing to consider the effects of her obesity-related sleep apnea, plaintiff's brief includes only the following two-sentence argument addressing the sleep apnea issue:

> SSR 00-3p recognizes that the effects of obesity may be and "some people with obesity also have sleep apnea "which can lead to drowsiness and lack of mental clarity during the day." SSR 00-3p further recognizes that "in cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.

(Plaintiff's brief, p. 12)(apparent omission and punctuation errors in original).

The ALJ's Decision.  In her decision, the ALJ refers to plaintiff's sleep apnea only in her summary of the evidence. She acknowledges plaintiff's hearing testimony of sleep apnea and fatigue in a cursory fashion, noting, "She stated she sleeps most of the day." (R. 13).  The ALJ's summary of the consultative psychologist's report includes plaintiff's complaint to the psychologist of constant fatigue (R. 14). The ALJ also noted that, "[o]n October 18, 2005, Dr. Sam C. West, Jr. saw the claimant who did not have the financial resources to pay the deductible to get the C-PAP machine, so she continued to have active problems with sleep apnea. This left her tired, sleepy and rather depressed during the day" (R. 15).  In addition, the ALJ stated that, when Dr. I. Douglas Jackson saw the plaintiff on January 11, 2005, "[s]he had obstructive sleep apnea per Dr. McDowell who had her tested. She had not gone for final testing so she did not have her C-PAP yet" (id.).[14]

The Commissioner's Response. The Commissioner acknowledges plaintiff's argument that the ALJ did not consider plaintiff's obesity and related sleep apnea properly (R. 14), but

---

[14]  As noted previously, the ALJ wrote that Dr. Robbins diagnosed "osteoarthritis " on March 6, 2006.  (R. 13).

addresses the obesity without any further reference to the allegation of sleep apnea. (Commissioner's brief, pp. 14-16). He refers to plaintiff's sleep apnea again only in the context of the credibility determination, arguing that plaintiff "failed to follow medical advice to use a CPAP device for treatment of sleep apnea," [15] and that an ALJ may consider noncompliance with treatment in discrediting allegations of disability. (Commissioner's brief, p. 22).[16] The Commissioner observes that plaintiff claimed an inability to afford the CPAP device but had medical insurance during the period at issue. (Id.)(citing R. 199, Dr. West's October 18, 2005, note that "she still does not have the financial resources to pay the deductible to get the CPAP machine" and R. 271, Dr. West's February 25, 2008, treatment note of plaintiff's report "that she now has insurance"). He argues that "[a] Social Security disability claimant's financial status and real motivation for not seeking treatment are questions of fact for the ALJ to decide in the first instance, and the ALJ may consider that the claimant failed to seek less costly treatment." (Commissioner's brief, p. 22).[17]

<u>Discussion regarding Sleep Apnea Issue</u>

The court is faced, on one hand, with an ALJ's decision which acknowledges parts of the medical evidence regarding sleep apnea but largely ignores plaintiff's allegations of resulting symptoms. On the other hand, however, the plaintiff – while alleging sleep apnea

---

[15] Again, there is no evidence that Dr. McDowell or any other physician prescribed the use of a CPAP machine.

[16] The ALJ did not cite plaintiff's noncompliance with CPAP treatment recommendations as a reason for finding her allegations to be less than fully credible. (See ALJ Decision, R. 9-18, and description, *supra*, of the ALJ's references to plaintiff's sleep apnea).

[17] The ALJ made no findings of fact regarding plaintiff's financial status or her "real motivation for not seeking treatment." (See ALJ Decision, R. 9-18).

in her application and testifying about its symptoms at the administrative hearing –
(1) provided no medical records evidencing complaints of or treatment for symptoms of sleep
apnea during the relevant period under adjudication, *i.e.*, the period following the application
filing date;[18] (2) made no complaint, when the DDS sent her to a physician for a consultative
examination to assess her physical condition, to that physician about sleep apnea or fatigue
and did not even report sleep apnea as part of her past medical history; and (3) failed to
provide documentation of her allegedly regular medical treatment from Dr. West and Dr.
Jackson for the period between early 2006 and 2008, even after the ALJ requested such
records and held the record open to receive it.[19] On balance, while the ALJ's analysis is less
than satisfactory, the court finds that any error by the ALJ as to plaintiff's allegation of sleep
apnea does not require reversal.

Plaintiff bears the burden of proving disability.  Ellison v. Barnhart, 355 F.3d 1272,
1276 (11th Cir. 2003)("[T]he claimant bears the burden of proving that he is disabled, and
consequently, he is responsible for producing evidence in support of his claim."). While
plaintiff was diagnosed with sleep apnea in late 2004 and complained of fatigue for some
period of time thereafter, Dr. McDowell's December 2004 letter to the plaintiff suggests that

---

[18] Dr. Robbins diagnosed obstructive sleep apnea on March 6, 2006 – after plaintiff's alleged onset date but before the filing date of the present application – when plaintiff reported her past medical history of obstructive sleep apnea during her consultation with him about gastric bypass surgery.  He noted, however, that plaintiff still needed the second night sleep study.  (R. 192).  Plaintiff did not thereafter return to Dr. Robbins for further evaluation or treatment, and there is no evidence of any sleep study conducted after 2004.

[19] As noted previously, the plaintiff provided some additional records. (See Exhibits 15-F-21F). However, no records indicate that plaintiff sought medical treatment from any provider for any reason between the time of Dr. Robbins' bariatric consult on March 6, 2006 and plaintiff's appointment with Dr. West on February 2, 2008.  There is no indication that plaintiff provided any additional evidence to the Appeals Council.

the severity of symptoms of sleep apnea do not remain constant.  (See R. 316)("If you feel that you have improved significantly and you no longer have any significant daytime sleepiness, then we need to repeat the overnight sleep test to document this.").  Plaintiff produced no medical evidence of sleep apnea post-dating the filing of the present SSI application, with the exception of the consulting GI physician's notation in 2008 of plaintiff's "sleep apnea not on CPAP."  Dr. Robbins' diagnosis of "OSA" rendered after plaintiff's alleged onset date (but before the filing date), also included his note that plaintiff needed the second sleep study.  Although plaintiff contends that she was unable to seek further treatment for her sleep apnea due to her inability to afford it, she failed even to mention sleep apnea or her allegations of resulting fatigue when she presented for her consultative physical examination.  Additionally, as discussed above, she failed to present documentation of other medical treatment that she *was* able to obtain during the relevant period, even after the ALJ requested it.  Under these circumstances, the court concludes that any failure by the ALJ to analyze expressly plaintiff's allegations of symptoms resulting from sleep apnea is fully countered by plaintiff's failure to carry her burden of proof.

### Fibromyalgia

Plaintiff contends that the ALJ erred by failing to find that her fibromyalgia is a "medically determinable impairment."  Although plaintiff's argument is unclear (see Plaintiff's Brief at p. 10),  it appears that she intended to argue, instead, that the ALJ should have found plaintiff's fibromyalgia to be a "severe" impairment.[20]  The most recent office visit documented in the record for a flare-up of fibromyalgia symptoms occurred in early July

---

[20] See Doc. #13, p. 8.

2005. (See R. 159-60; R. 148). On January 25, 2006 – four months before plaintiff filed the present application – Dr. Jackson observed that plaintiff's "Fibromyalgia seems to be stable." (R. 158). The record includes no evidence of any further treatment by Dr. Dungan – the doctor who followed plaintiff for fibromyalgia (see Exhibit 4F) – other than continued prescriptions for medication through December 2005. (R. 148). The record also lacks evidence of additional treatment by Dr. Jackson until June 2008, when he treated plaintiff for the instance of acute gastroenteritis which resulted in plaintiff's brief hospitalization. (R. 275-75, 331). The issue before the ALJ at step two of the sequential analysis is not only whether plaintiff has a medically determinable impairment but, also, how that impairment limits the claimant's ability to work. See Moore v. Barnhart, 405 F.3d 1208, 1213 n. 6 (11th Cir. 2005)(noting that the "mere existence" of an impairment does not reveal the extent to which it limits the claimant's ability to work and citing McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) for its statement that "'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work"). Plaintiff's testimony at the hearing regarding symptoms of fibromyalgia was limited and vague, and it prompted the ALJ's request that plaintiff submit additional records evidencing her treatment after 2006. See R. 29-30. In her decision, the ALJ noted Dr. Jackson's January 2006 observation that plaintiff's fibromyalgia seemed to be stable and, also, that plaintiff then had no current constitutional symptoms. (R. 15). She further described Dr. Robbins' diagnoses in March 2006, Dr. Banner's diagnoses in July 2006, and Dr. Jackson's findings – upon physical examination in June 2008 – that plaintiff had "no point spinal tenderness." (R. 14, 16). In the absence of any records documenting treatment for fibromyalgia during the relevant time

period, the ALJ did not err in failing to find plaintiff's fibromyalgia to be "severe."

## Plaintiff's Remaining Contentions

The court has considered the entire record and each of the remaining allegations of error plaintiff raises in her brief. The additional issues identified by plaintiff do not constitute grounds for reversal.  Plaintiff contends that the ALJ did not consider her obesity properly; however, the decision reflects that the ALJ was aware of and considered plaintiff's obesity in assessing the extent of plaintiff's limitations.[21]

Plaintiff also challenges the ALJ's consideration of the opinions of her treating physicians, and cites the Commissioner's regulations pertaining to treating physician findings. (Plaintiff's brief, pp. 9-10). She argues – without pointing to any particular opinions of treating physicians or identifying supporting evidence  – that the ALJ "disregarded all of [her] treating physician's [sic] as well as the finding from the consultative examinations which reflected that claimant would need long term medical care"[22] and that "the ALJ should have found that she had severe medical impairment relating to her Fibromyalgia, degenerative disc disease resulting in chronic low back pain, obstructive sleep apnea, osteoarthritis, obesity, with a BMI of 48.4, and bowel incontinence related to Irritable Bowel

---

[21]   The ALJ noted plaintiff's diagnosis of obesity (R. 14), her weight of 256 pounds and height of 5'1" upon examination by Dr. Banner (R. 13), and her report to Dr. Robbins that she had "tried and failed multiple weight loss attempts" (id.).  Plaintiff points to her body mass index of 48 and argues that it could, in conjunction with her other diagnosed physical impairments (including sleep apnea), cause greater limitation of function.  (Plaintiff's brief, pp. 11-12).  However, the ALJ found that plaintiff *has* physical limitations – that she is limited to light work and can climb, balance, stoop, kneel, crouch, and crawl only occasionally.  (R. 12).  Plaintiff cites no medical evidence that her obesity, either alone or in conjunction with other impairments, imposes a greater limitation than that assessed by the ALJ.

[22]   The latter statement from Dr. Banner (see R. 237) does not translate into particular functional limitations and, clearly, does not equate to an opinion that plaintiff is unable to work.

Syndrome." (Id., p. 8).  The court concludes that plaintiff's "treating physician" argument boils down to a contention that the ALJ should have found various diagnoses rendered by treating physicians to be "severe."

Contrary to plaintiff's argument, the ALJ *did* find that her osteoarthritis is a severe impairment. (R. 11, Finding No. 2).  The plaintiff does not argue and has not demonstrated that the "osteoarthritis" found to be "severe" by the ALJ differs in any meaningful way – *i.e.*, with regard to functional limitations – from plaintiff's previous diagnoses of degenerative disc disease or degenerative joint disease.  In May 2004, a radiologist, Dr. Veale, reported that plaintiff's May 6, 2004, MRI showed "mild disc dessication at L4-5 with no disc herniations or encroachments upon the thecal sac at any level." (R. 157).  The following week, Dr. Dungan wrote that this same MRI "reveal[ed] mild disc bulging and some foraminal narrowing on the right at L4-5" but, also, that plaintiff's medications had "pretty much resolved a lot of her pain." (R. 150).  When Dr. Dungan next saw plaintiff fourteen months later – the last time Dr. Dungan evaluated the plaintiff – she did not include degenerative disc disease among her diagnostic "impressions" but did note that plaintiff has "chronic low back pain with some degenerative discs and central obesity." (R. 148). In March 2006, Dr. Robbins' diagnoses included DJD. (R. 192).  Plaintiff provided evidence that she sought treatment on December 18, 2006 – during the relevant period – from "1st Med" for back pain, that the physician ordered x-rays of plaintiff's lumbosacral spine, and that the x-rays were reported to plaintiff as having shown "Arthritis (degenerative changes)[.]" (R. 267-68).  Implicit in the ALJ's finding that plaintiff has "severe" osteoarthritis is a conclusion that plaintiff's medically determinable impairment of

osteoarthritis significantly limits plaintiff's ability to perform basic work activities. (R. 10-11; see 20 C.F.R. § 416.921). Plaintiff has demonstrated no error in the ALJ's failure to include plaintiff's additional diagnosis of "degenerative disc disease" at step two of the sequential analysis.

At the administrative hearing, plaintiff testified regarding bowel incontinence and her June 2008 hospitalization (R. 28). In her consultative examination in July 2006, she complained to Dr. Banner of "daily diarrhea" (R. 234). While plaintiff has been diagnosed with irritable bowel syndrome, she identifies no evidence of record that – during the relevant period – her irritable bowel syndrome caused bowel incontinence at any point other than in June 2008, when plaintiff's acute gastroenteritis resulted in her hospitalization for a few days. Plaintiff's treatment notes for that hospitalization indicate that she usually had bowel movements only twice a week, that she was most often constipated, and that the symptoms which resulted in her hospitalization cleared rapidly. (R. 272-76). Plaintiff's evidence does not demonstrate bowel incontinence of sufficient frequency during the relevant period to demonstrate that the ALJ erred in failing to find it to be "severe."

Plaintiff contends that the ALJ erred in assessing her credibility, merely finding her complaints to be inconsistent with the RFC the ALJ assessed. The ALJ stated her credibility conclusion – but with no reference to her reasons – on page 5 of her decision. (See R. 13). Thereafter, she set forth a three-page summary of the exhibits in evidence. (R. 13-16). Finally, within the second paragraph of page 8 of her decision, the ALJ shifted from summarizing the evidence and stated the specific medical evidence on which she relied in concluding, at the end of that paragraph, that "[t]he medical evidence from Dr. Banner and

18

Dr. Jackson, and the record as a whole does not indicate any functional limitations that would preclude the claimant from performing light exertional work activity." (R. 16). The ALJ did not expressly relate this later conclusion back to her earlier-stated credibility determination. However, despite the decision's suggestion that this paragraph includes only the ALJ's assessment of the weight she is assigning to the opinion evidence,[23] the second paragraph of page eight does include the ALJ's reasons for finding plaintiff's physical complaints to be less than fully credible. The ALJ's reason for rejecting plaintiff's allegations of disabling mental limitations – *i.e.*, that the allegations are inconsistent with the treatment notes of plaintiff's long-time treating psychiatrist – is set forth at the end of the following paragraph, after the ALJ's explanation of her reasons for rejecting the opinion of the consulting psychologist. The ALJ's credibility determination – while difficult to locate within the opinion – is minimally sufficient to avoid reversal.

### Plaintiff's Mental Limitations

Plaintiff raises no specific challenge to the ALJ's rejection of Dr. Ghostley's opinion regarding plaintiff's mental limitations or to the ALJ's implicit rejection, in part, of the opinion of Dr. Eno, the non-examining state agency psychologist. (See Plaintiff's brief).[24]

---

[23] The paragraph begins with the phrase, "As for the opinion evidence . . ." (R. 16).

[24] Plaintiff includes some of Dr. Ghostley's conclusions and the non-examining state agency psychologist's conclusions in his statement of facts (see Plaintiff's brief, pp. 6-7). However, in the section entitled "Summary of the Argument and Standard of Review," plaintiff addresses only her physical impairments (see id. pp. 8-9). In the "Argument" section of her brief, plaintiff argues that the ALJ erred: (1) "when she put more weight on the residual functional capacity assessment than on the claimant's statements regarding her limitations and her treating physician's [sic] who have been treating the claimant for greater than five years[,]" (a contention rejected above); and (2) in failing to find, in accordance with the VE's testimony *in response to the hypothetical accepting plaintiff's subjective testimony as fully credible*, that there are no jobs such an individual can perform (a contention the court now rejects, for obvious reasons). (See id., pp. 9-10). Except to the limited extent that these two arguments implicate her mental

The reasons stated by the ALJ for rejecting Dr. Ghostley's opinion that plaintiff's "ability to understand, remember and carry out instructions as well as to respond appropriately to supervisors, co-workers, and work pressures in a work setting, is moderately to markedly impaired" – *i.e.*, that Dr. Ghostley's opinion is not supported by his own examination report and conflicts with Dr. West's treatment notes – are both adequate and supported by substantial evidence. (See R. 16, 247-48). Plaintiff's treating psychiatrist, Dr. West, has expressed no opinion regarding the degree to which plaintiff is limited in performing work-related mental functions. Since the ALJ has stated adequate reasons for discounting Dr. Ghostley's opinion, the ALJ was entitled to rely on other evidence of plaintiff's mental limitations, including the assessment of non-examining psychologist Dr. Eno. (See Milner v. Barnhart, 275 Fed. Appx. 947 (11th Cir. 2008)(unpublished opinion)(where ALJ rejected conflicting opinion of one-time examining physician properly, ALJ did not err by giving substantial weight to the opinions of non-examining psychologists); Wainwright v. Commissioner of Social Security Administration, 2007 WL 708971 (11th Cir. 2007)(unpublished opinion)(where ALJ rejected examining psychologist's opinion properly, the ALJ was entitled to rely on the opinions of non-examining state agency psychologists). The ALJ was, in fact, required to consider Dr. Eno's opinion. (See SSR 96-6p).

In her decision, the ALJ failed to state the weight she accorded to Dr. Eno's opinion; indeed, she did not mention Dr. Eno's opinion at all. (See R. 9-18; see also Hoffman v. Astrue, 259 Fed. Appx. 213, 217 (11th Cir. 2007)("The ALJ is required . . . to state with particularity the weight she gives to different medical opinions and the reasons

---

status, none of plaintiff's contentions go, even arguably, to the ALJ's mental RFC findings.

why.")(citation omitted).  In two of the four broad areas of mental functioning the ALJ was required to rate in evaluating plaintiff's claim of mental limitations (see 20 C.F.R. § 416.920a(c)), the ALJ's ratings diverge inexplicably from Dr. Eno's.  Dr. Eno concluded that plaintiff has "mild" limitations in activities of daily living and "moderate" limitations as to concentration, persistence or pace (R. 259); the ALJ, in contrast, found "mild" limitations in concentration, persistence or pace and "moderate" limitations in activities of daily living (R. 11-12).  The ALJ's deviation from the state agency expert's findings, without any explanation, is error.  However, in this case, the error is harmless. The mental limitations included in the ALJ's RFC finding – i.e., that plaintiff is limited to work "involving only very short and simple instructions, attending for only 2 hour periods and involving work with infrequent exposure to the general public" – mirror Dr. Eno's opinion regarding plaintiff's mental residual functional capacity.  (See R. 12, 265).  Accordingly, although the ALJ erred in failing to explain the weight she gave to Dr. Eno's opinion, the error does not require reversal.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the Commissioner's decision is supported by substantial evidence and that the ALJ's legal errors do not require reversal.  Accordingly, the court will enter a separate judgment affirming the Commissioner's decision.

DONE, this 22nd day of February, 2011.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE